## BARTON W. FLOWERS AND ANOTHER v. LULU M. GERMANN AND OTHERS.[1]

December 19, 1941.

No. 32,997.

[1]Reported in 1 N. W. (2d) 424.

*Harvey O. Sargeant,* for appellants.
*Raymond J. Rockstroh,* for respondents.

JULIUS J. OLSON, JUSTICE.

Ejectment to recover possession of a parcel of land in one of the suburban sections of St. Paul. It is a narrow strip, about 21 feet in width and 190.6 feet in length, extending east and west. Defendants' answer denied plaintiffs' ownership and pleaded that for the reasons and upon facts there alleged there should be reformation of the title deeds under which the respective parties claimed ownership. The court found for plaintiffs, denied reformation, and also denied defendants' blended motion for amended findings or a new trial. Defendants appeal.

On March 29, 1923, one Robert C. Jones acquired title to the west 190.6 feet of the east 504.4 feet of that part of the SE¼ of section 34, town 29, range 22, "lying south of the Hudson road." On May 1, 1923, Jones and wife executed two mortgages to the Reed Mortgage & Investment Company, one covering the "north half," the other the "south half," of this property. Hudson road is not on a section line. It is 66 feet wide. In conveyances made prior to the time Jones acquired the property it had been described by metes and bounds running upon the center line of Hudson road as the north boundary, the south boundary being the section line street known as Burns avenue, 60 feet in width. Later, the mortgage company assigned the mortgage covering the south half to C. E. Reed, its president and principal managing officer. Both mortgages later were foreclosed, each mortgage holder bidding at the sale. There was no redemption. In all the instruments and transfers since May 1, 1923, these properties were referred to as "the north half" and "the south half" of this parcel. After title was acquired under the foreclosure sales, Mr. Reed dealt with both halves as though they were his individual properties. Thus, on July 16, 1930, he entered into a contract in his individual capacity to convey the west half of the north half to Samuel and Gretchen Roberts. On September 26, 1932, he made a

similar contract with one Herman in respect to the east half. This occurred while his company was in fact the record title-holder. Prior to the making of the Herman contract, June 2, 1932, surveyor Brettschneider made a survey of this area showing that the north half extended 678 feet from the southern boundary of the Hudson road. The same distance to Burns avenue is shown on his blueprint. But he did not run his survey to the center of that street. He testified that "the purpose of the survey * * * was to divide this piece in two." He also found "the location of certain monuments" upon what he deemed the boundary between the north and south half. These markers or stakes are shown on his blueprint. This blueprint was then given to Mr. McAdams, a realtor doing business in St. Paul and a man of many years' experience in that line of endeavor. He acted as the agent for both Mr. Reed and his company throughout the transactions to which we shall now refer. In the drafting of contracts and deeds relating to these properties he used this blueprint as his guide.

In August 1935, defendant Lulu M. Germann purchased through Mr. McAdams what was intended to be that part of the west half of the north half lying south of the then newly constructed highway No. 12, which had been built some time after the foreclosures had ripened into title. There were iron stakes pointed out as being the south boundary. In addition, this further fact appears: The defendants then were, and for a period of some years had been, residents and occupants of premises adjoining this area and as such knew where the boundary line stakes were. In the deed conveying the property it was described as—

"That portion of the West 190.60 feet of the East 504.40 feet of that part of the Southeast Quarter (SE¼) of Section Thirty-Four (34), Township Twenty-nine (29), Range Twenty-two (22), lying South of the Minnesota Trunk Highway No. 12, formerly known as Trunk Highway 108, now located and established over and across said property, *except the Southerly 708 feet thereof.*" (Italics supplied.)

The present difficulty arises by reason of the italicized exception. Mr. McAdams' explanation of it is that he accepted as correct surveyor Brettschneider's figures in respect to the lateral distances north and south, and in drawing the deed to Mrs. Germann he added 30 feet, *i. e.*, half the width of Burns avenue, to the surveyor's figure of 678, as being within the exception, thus bringing the sum to 708 feet. That Brettschneider's figures were erroneous in respect to distances north and south is plainly seen by observing the result of other and later surveys (to which reference will be made later). Mr. Brettschneider, with commendable candor, testified: "I am inclined to believe the figures shown on here [his blueprint] are incorrect."

Defendants, during 1935, in good faith and in reliance upon the accuracy of the line as established upon the ground and the representations theretofore made in regard to it, constructed a large cement barn upon the southwesterly portion of the premises so acquired. (Reference only to the barn is made because that is the only structure directly affected by this action. In addition and in close proximity thereto, defendants had their home, farmyard, and the equipment of the ordinary truck farmer.) Thus matters rested until the summer of 1937, when Mr. Flowers came into the picture. He had observed a "For Sale" sign upon the southerly portion of the premises while driving along Burns avenue in company with one Lampland, and he orally authorized Lampland to get that part, within certain price limits. Shortly thereafter he went over the premises and saw what was obvious to everyone, the location of defendants' concrete barn a short distance to the west and north of an iron post in the ground, with two trees in line therewith to the east. The stake is one theretofore placed there before any of the surveys referred to in the evidence were made. Defendants' possession was such that no one could doubt its efficacy to put persons dealing with the property on notice. Flowers testified that he did not expect to get any of the improvements of his neighbors.

On June 26, 1937, surveyor Welch, employed in Mr. Flowers' behalf, surveyed the premises and furnished a blueprint thereof to his counsel who were employed to examine the abstract of title. This blueprint shows that plaintiffs' property, if accepted in accordance with the depth there shown, 708 feet north to south, would cut into defendants' cement barn several feet. Later, on August 11, 1937, plaintiffs' title examiners wrote Mr. Flowers as follows:

"We have examined the attached abstract covering [the described premises]" and "we find title to be vested in C. E. REED subject to the following: * * *

"The survey of the premises in question, which is attached hereto, disclosed the fact that the distance from the south line of the section to the Hudson Road is 1,375 feet on the west and 1.358 on the east. *The south half of this piece of property* would comprise a strip of land 687½ feet long on the west side and 679 feet on the east line. The deed which you obtained from Mr. Reed covers a piece of property 708 feet in depth." In consequence, "to clear up this defect a quitclaim deed should be obtained from the Reed Mortgage & Investment Company. * * *

*"You will observe the usual precaution with reference to adverse occupancy, encroachments and recent improvements."* (Italics supplied.)

Pursuant to the suggestions made by counsel, plaintiffs' son-in-law, an employe of the federal agency to which he had applied for a loan, called on Mr. McAdams and told him that "on account of this different description 708 feet there was some little discrepancy and it didn't amount to anything at all but the Minnesota Federal were making a loan and were particular to have every 'I' dotted and 'T' crossed and he asked as an accommodation if I would send the deed out" for execution. McAdams did so, and the quitclaim deed from the corporation to plaintiffs covering the entire area, 708 feet in depth, was procured and later recorded. This was

done without the payment of any consideration and simply as a matter of routine courtesy.

It is interesting to note, too, that in the blueprint attached to the letter from his examining attorneys Mr. Flowers was advised that the total distance on the west side of plaintiffs' and defendants' parcels was 1,375 feet. By deducting 708 feet as the south portion, there would be left for the north half only 667 feet to Hudson road. The difference between the two halves is 41 feet, half of which (20.5 feet) would bring the boundary within inches of the physical location of the boundary markers. A blueprint of a later survey by Mr. Armstrong, made October 31, 1940, shows the westerly line to be 1,380.5 feet, the easterly line 1,364.08 feet, between the southerly boundary of Hudson road and the center of Burns avenue. (The difference in distances is due to a curve southeasterly of Hudson road.) According to his survey, the easterly line of plaintiffs' property extends north 686.85 feet, at which point it meets the old staked line which when extended due west leaves the barn 7.9 feet north of the staked dividing line. His blueprint shows two small oaks immediately east of the easterly boundary stake or marker. It also shows all the other stakes along that line to the westerly boundary in harmony with, and actually upon, the staked, *i. e.,* the physical, boundary.

With these compelling facts facing him, Mr. Flowers nonetheless procured and filed for record on September 17, 1937, his warranty deed from Reed, also the quitclaim deed from the Reed Mortgage Company.

■ That there was in fact a mutual mistake in respect to this boundary seems to be clearly established. Therefore, the question is whether defendants' possession of an area slightly exceeding that covered by their deed constituted notice to plaintiffs of their claim of right to a complete equitable title to the entire tract. That question, we think, is answered by our cases which uniformly hold that "possession is not only *prima facie* evidence of title but is also notice of whatever rights the possessor has which would be disclosed upon reasonable inquiry." Farmers State

Bank v. Cunningham, 182 Minn. 244, 246, 234 N. W. 320, 321. That statement is but a reiteration of what this court said and held in Minor v. Willoughby & Powers, 3 Minn. 154, 163 (225). So also in Morrison v. March, 4 Minn. 325, 331 (422), this court quoted with approval from Willard, Eq. Jur. 251, as the "reason of the rule" stated in the Willoughby case, that: " 'A party dealing with real estate of which another is in the actual possession, is bound to make inquiries of the occupants, and to ascertain the nature and extent of their interests. The legal presumption is that he will make these inquiries, and he is estopped to deny that he made them.' " To the same effect are the holdings in Groff v. Ramsey, 19 Minn. 24, 35 (44) ; Siebert v. Rosser, 24 Minn. 155, 161; Niles v. Cooper, 98 Minn. 39, 107 N. W. 744, 13 L.R.A.(N.S.) 49; Jefferson County Bank v. Erickson, 188 Minn. 354, 357, 247 N. W. 245; and Ludowese v. Amidon, 124 Minn. 288, 295, 144 N. W. 965.

■ Plaintiffs not being good faith purchasers without notice, it logically follows that reformation, on that ground, of the deeds under which the respective parties claim title may not be denied. Plaintiffs' title to the disputed strip depends upon the value of their quitclaim deed from the mortgage company. They can claim no more or better title than that possessed by their grantor. In that situation, if the mortgage company were the plaintiff here, could it prevail in this action upon the facts here presented? Obviously not, since the principle (29 Minn. 325) "that equity looks upon things as done which ought to be done" is as potent a factor against plaintiffs as it would be if their grantor were here and now pursuing their remedy. Being chargeable as a matter of law with notice of defendants' equities, they cannot escape the consequences flowing from established facts. A court of equity will not hesitate to declare equitable results. Lebanon Sav. Bank v. Hollenbeck, 29 Minn. 322, 325, 13 N. W. 145; Hicks v. Fruen Cereal Co. 182 Minn. 93, 97, 233 N. W. 828.

■ The question of whether there is a defect of parties requires consideration. The rule is that "a party who has neither demurred,

because of defect of parties, nor set up such defect by answer, is not entitled to a dismissal of the action on the merits" on that ground. Kanne v. Kanne, 119 Minn. 265, 266, 138 N. W. 25. If no such objection is made the defect will be deemed waived. And there is no distinction as to such defect between parties plaintiff and defendant. Hanson v. Bowman, 199 Minn. 70, 73, 271 N. W. 127; 5 Dunnell, Dig. & Supp. § 7323, and cases under note 5. No such objection having been made to the trial court, it cannot be raised here.

■ While it is true that, generally speaking, a court of equity will not proceed in a suit unless all parties necessary for the full protection of each are before the court, *Id.* § 7316, and cases under note 60, the fact remains that as to who shall be made parties in any equity suit is a question of convenience and discretion rather than of absolute right. *Id.,* and cases under note 65. There is a distinction between necessary parties and proper parties. It well may be that the grantors in both deeds under which claim of title is made by the parties to this suit would be proper parties. The distinction is well pointed out in Tatum v. Roberts, 59 Minn. 52, 56, 60 N. W. 848, 849, thus:

"(1) 'Necessary parties,' when the term is accurately used, are those without whom no decree at all can be effectively made determining the principal issues in the cause. (2) Proper parties are those without whom a substantial decree may be made, but not a decree which shall completely settle all the questions which may be involved in the controversy, and conclude the rights of all the persons who have any interest in the subject-matter of the litigation."

■ Here the "principal issue" is whether plaintiffs or defendants are the owners of the disputed strip. Clearly, "a substantial decree may be made," even though it may not "completely settle all the questions which may be involved in the controversy" so as to "conclude the rights of all the persons who have any interest in the subject matter of the litigation." 5 Dunnell, Dig. & Supp.

§ 7316, and cases under note 66. As recently said in Schaefer v. Thoeny, 199 Minn. 610, 617, 273 N. W. 190, 194:

"The extent to which equity will go to provide relief where legal remedy is wanting or inadequate is not a matter of fixed rule. Rather it rests in the sound discretion of the court. 'Whether the decree will prove so useless as to lead a court to refuse to give it, is a matter of judgment to be exercised with reference to the special circumstances of each case rather than to general rules which at most are but guides to the exercise of discretion.' [Citing authorities.]"

■ At most, the grantors' interests are consequential rather than direct. Therefore the rule applicable to "necessary parties" "does not extend to those who are [only] consequentially interested in the subject matter." 5 Dunnell, Dig. § 7316, and cases under note 62. *Cf.* Wieneke v. Deputy, 31 Ind. App. 621, 68 N. E. 921; Grossbach v. Brown, 72 Wis. 458, 40 N. W. 494; Butler v. Butler, 93 Misc. 258, 157 N. Y. S. 188; Gebel v. Weiss, 42 N. J. Eq. 521, 8 A. 889; 53 C. J. pp. 1006, 1007 [§ 158]3, and cases cited under notes 13 to 16.

■ Even if we were to hold, which we do not, that either or both of the grantors (Reed and the mortgage company) are "necessary parties," the proper practice would be to continue the suit or to delay the trial until they can be brought in as parties. Harper v. Carroll, 66 Minn. 487, 507, 69 N. W. 610, 1069; Kanne v. Kanne, 119 Minn. 265, 271, 138 N. W. 25. 5 Dunnell, Dig. § 7325, and cases under notes 9 and 10. But here the action has been tried on its merits. The court has considered and determined all opposing claims of the parties directly involved. We believe it is not for us to erect mere procedural hurdles or barriers to a final determination of all issues presented, so that there may be finality as to the present parties.

There must be a reversal, but it will be without prejudice to the right of the trial court to hear and consider an appropriate motion to join as parties to this action either or both of the grantors

422

under whom the present parties derive their titles. Upon that court initially rests the burden of determining who should be joined as parties, whether they be "necessary" or only "proper" parties.

So ordered.

