Amos GRAVES, Appellant,

v.

Michael WAYMAN, et al., Respondents,

REA Group, Inc., Respondent,

C & M Real Estate Services Group, Inc., Respondent,

Trademark Properties Group, LLC, Respondent,

First Minnesota Bank, Respondent.

No. A11–1521.

Court of Appeals of Minnesota.

July 9, 2012.

Jerámie R. Steinert, Steinert P.A., Minneapolis, MN for appellant.

Jack E. Pierce, Pierce Law Firm, Minneapolis, MN; and Chad Anthony Kelsch, Kelsch Law Firm, P.A., Minneapolis, MN for respondents Michael Wayman, et al.

REA Group, Inc., Elk River, MN respondent.

C & M Real Estate Services Group, Inc., Elk River, MN respondent.

Trademark Properties Group, LLC, Elk River, MN respondent.

Thomas G. Wallrich, Peter L. Crema Jr., Hinshaw & Culbertson LLP, Minneapolis, MN for respondent First Minnesota Bank.

Considered and decided by KALITOWSKI, Presiding Judge, SCHELLHAS, Judge, and CHUTICH, Judge.

## OPINION

SCHELLHAS, Judge.

In this foreclosed-residential-real-property dispute, appellant—foreclosed homeowner challenges the district court's order awarding title to his real property to respondent-bank, arguing that the district court erred by (1) determining that the bank was a bona fide purchaser, (2) amending the judgment to eliminate appellant's vendor's lien against the property, and (3) dismissing appellant's common-law fraud claim. Because we conclude that respondent-bank is not entitled to protection as a bona fide purchaser under Minn. Stat. § 325N.17(f)(3), we reverse the district court's award of title to the property to respondent-bank. Additionally, for the reasons set forth below, we reverse the dismissal of appellant's common-law fraud claim and remand this case to the district court for entry of judgment consistent with this opinion.

## FACTS

In 1999, appellant Amos Graves and his now-deceased wife (foreclosed homeowners) purchased the residential real property that is the subject of this case and granted a purchase-money mortgage to Norwest Mortgage Inc., which assigned its interest to Wells Fargo. Wells Fargo foreclosed its mortgage and purchased the sheriff's certificate for $101,867.07 on March 13, 2007. In August 2007, respon-

dent Michael Wayman visited the foreclosed homeowners and told them that "he could save the house." On August 15, the foreclosed homeowners signed documents provided to them by Michael Wayman, as follows: a quitclaim deed [2] in favor of respondent REA Group Inc.; a "Rent Back Agreement" with respondent C & M Real Estate Services Group Inc.; a purchase agreement with REA for the sum of $182,000; and a residential lease that names the foreclosed homeowners as lessors and C & M as lessee. Both REA and C & M were wholly owned by Michael Wayman.

On August 15, Michael Wayman also provided the foreclosed homeowners with a document entitled "Cancellation of Contract Notice," which states in pertinent part:

*Date: 8/15/07*

You may cancel this transaction, without any penalty or obligation, within three business days from the above date. To cancel this transaction, mail or deliver a signed and dated copy of this cancellation notice, or any other written notice to:

C & M Real Estate Services Inc., PO BOX 756, Anoka, MN 55303 or fax to 763–274–2786 or email to mikewayman@comcast.net

NOT LATER THAN MIDNIGHT OF THE 3rd (reconveyance) OR 5th (if purchase strictly) BUSINESS DAY *8/18/07* (date).

On the evening of August 15, the foreclosed homeowners left C & M a telephone message cancelling the transaction, and they signed and mailed the cancellation notice to C & M on August 16. Although the foreclosed homeowners believed that they had canceled their transaction with REA and C & M, from September 2007 until May 2009, they paid rent to C & M under the rent-back agreement.

Despite the foreclosed homeowners' notice of cancellation of the transaction, REA recorded the August 15 quitclaim deed on September 5. And, on September 11, REA granted C & M a mortgage on the property in the amount of $100, C & M recorded its mortgage, and C & M recorded its notice of intention to redeem the property. No one redeemed the property during the homeowners' redemption period that ended on September 13. On September 17, respondent First Minnesota Bank (FMB) loaned C & M $145,000 to redeem the property, securing the loan with the property; C & M redeemed the property as a junior creditor by paying the sheriff $110,355.73; and C & M recorded the certificate of redemption. A HUD settlement statement prepared for the loan closing at FMB reports that the foreclosed homeowners received $30,577.16 from the proceeds of C & M's $145,000 loan. But they received nothing from the closing nor did they receive any portion of the $182,000 purchase price contained in the purchase agreement that they signed on August 15.

C & M defaulted on its loan from FMB, FMB foreclosed its mortgage, and FMB purchased the property at a sheriff's sale on August 12, 2009, for $145,000. No one redeemed the property during the six-month redemption period.

Graves commenced this action against Michael Wayman, Cori Wayman, REA, C & M, FMB, and respondent Trademark Properties Group LLC. Graves sought a declaration that the August 15 transaction be deemed an equitable mortgage against the property and that he be deemed the owner of the property, free and clear of any of respondents' interests; alternative-

---

**2.** Although Cori Wayman was not present and therefore did not witness the foreclosed homeowners' execution of the quitclaim deed, she notarized the quitclaim deed.

ly, on a sale theory, Graves sought a superior vendor's lien against the property, requesting that the property be sold to satisfy the lien. He also alleged multiple violations of mortgage, lending, and consumer-protection laws; common-law fraud; and unjust enrichment. In its answer, FMB asserted that it was a bona fide purchaser of the property. Before the court trial commenced, the district court required Graves to choose one theory of recovery, and Graves chose to proceed under the sale theory—that he had sold the property to REA/C & M and was entitled to a superior vendor's lien. Graves testified at trial that, although he sought financial assistance from public and nonprofit entities, he never completed a loan application to secure funding to redeem the property and never had enough money to redeem the property from Wells Fargo's foreclosure.

FMB Executive Vice President Charles Blair testified that FMB Loan Officer Bryan Guse, who did not testify, closed FMB's September 17 loan to C & M. Blair also testified that the $145,000 loan was part of a master loan agreement that C & M had with FMB to finance its business of redeeming sheriff's certificates. Blair testified that Guse was responsible for reviewing title conditions prior to funding the loans, and Blair was not aware of any correspondence between anyone at FMB and the foreclosed homeowners. But months before FMB closed its $145,000 loan with C & M, FMB obtained a title-insurance commitment for the property. In addition to the interest of the foreclosed homeowners as fee owners, Schedule B–Section II of the title commitment reported the 1999 mortgage; Wells Fargo's foreclosure of that mortgage; Wells Fargo's purchase of the sheriff's certificate on March 13, 2007; and the rights of tenants and others in possession of the property. Blair testified that handwritten initials on the title commitment signaled to FMB that

these matters had been "addressed" by the title company.

On January 18, 2011, the district court issued its findings of fact, conclusions of law, and order, declaring that "Defendant Waymans and their solely owned corporate entities" violated Minn.Stat. §§ 325N.10–.18 (the Minnesota homeowner's equity-protection act (MHOEPA)); awarding Graves title to the property, "free of the interest of any Defendant"; declaring the quitclaim deed, rent-back agreement, lease agreement, and purchase agreement "between [Graves] and Defendants Wayman" void; awarding Graves exemplary damages against REA, C & M, Cori Wayman, and Michael Wayman jointly; declaring that "[Graves's] vendor's lien against the subject property is ... superior to that of [FMB];" and awarding Graves "attorney's fees in an amount to be determined by separate application made within twenty (20) days from the Date of this Order." The court denied FMB's claim that, because "it ... discharged [Graves's] debt," it should have a first-priority lien against the property based on the doctrine of equitable subrogation. The court explained in its conclusion of law:

> This theory fails for numerous reasons. First, [Graves] had no debt because the debt was extinguished at a sheriff's sale, leaving only a right to redeem, which is not a debt. Second, [FMB] has an adequate remedy at law under the promissory note with C & M and the Waymans. Third, [FMB] will lose nothing because it already has a judgment against C & M and the Waymans for its full amount. It cannot claim it will sustain an injury. Fourth, there was no justifiable or excusable mistake of fact involved. [FMB] knew the transaction involved a foreclosure reconveyance and received a copy of the Purchase Agreement. By viewing the Settlement Statement, it knew or should

have known that [Graves] was owed money. Finally, Minn.Stat. § 325N.17(b) requires that [Graves] be paid according to the statute. Therefore [Graves is] entitled to both a statutory and vendor's lien on these proceeds.

[FMB] has not sustained its burden of proof.

FMB subsequently moved for amended findings or a new trial.

On April 27, 2011, the district court issued amended findings of fact, conclusions of law, and an order, declaring that "Defendant Wayman and the corporate entities, C & M and REA" violated the MHOEPA; awarding Graves title to the property, *"subject to the interest of [FMB] as a bona fide mortgagee"*; declaring the quitclaim deed, rent-back agreement, lease agreement, and purchase agreement "between [Graves] and Defendants Wayman, C & M and REA" void; awarding Graves exemplary damages against REA, C & M, and Michael Wayman "jointly and severally"; and awarding Graves "attorney's fees in an amount to be determined by separate application made within twenty (20) days from the Date of this Order." (Emphasis added.) FMB moved to clarify findings or, in the alternative, to correct clerical mistakes. Graves moved for amended findings and conclusions or a new trial.

On June 15, 2011, the district court issued two orders, one denying Graves's motion and one in which the court found that "the subject property was purchased from foreclosure by [FMB], a bona fide purchaser and the highest bidder. The redemption period having expired, [FMB] is the owner of the premises free and clear of any encumbrances of other parties," and ordered that "[FMB] owns the subject property free and clear of encumbrances of other parties."

Graves appealed, seeking review of four of the district court's orders, filed January 18, April 27, and June 15, 2011.

During the pendency of this appeal, Michael Wayman and Cori Wayman filed for bankruptcy. A special-term panel of this court ruled "that the bankruptcy stay is limited to claims against the Waymans and does not affect claims against the other respondents" and ordered that "[t]he balance of this appeal, including claims by appellant against all other respondents, shall proceed." *Graves v. Wayman*, No. A11–1521 (Minn.App. Oct. 14, 2011) (order).

## ISSUES

I. Under Minn.Stat. § 325N.17(f)(3), does FMB have an interest in the property as a bona fide purchaser?

II. Did the district court err by dismissing Graves's claim of common-law fraud?

## ANALYSIS

In an appeal from a court trial, this court reviews the district court's findings of fact under the clearly erroneous standard. *City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 24 (Minn.2011). We will not overturn a district court's ruling if it is free of legal or factual errors unless the court exercised its discretion in an arbitrary or capricious manner. *Id.*

As an initial matter, we address FMB's argument that, on appeal, Graves has disavowed his theory of the case developed in district court. FMB asserts that Graves argued in district court that his transaction with REA and C & M was a sale and that he therefore was entitled to a vendor's lien on the property. FMB complains that Graves now argues that he canceled the transaction with REA and C & M before FMB received its purported mortgage interest and therefore that FMB has no interest in the property. Generally this court only considers issues that were presented to and considered by the district

court. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988). But appellate courts also have "the latitude to address any matter as the interest of justice may require." *Weston v. McWilliams & Assocs., Inc.,* 716 N.W.2d 634, 641 (Minn.2006) (quotation omitted); *see* Minn. R. Civ.App. P. 103.04 (noting that appellate courts may address issues as justice requires). In this case, we conclude that justice requires our consideration of Graves's cancellation of the transaction with REA and C & M and the legal effect of that cancellation on FMB's interest in the property.

### I. Bona–Fide–Purchaser Protection under Minn.Stat. § 325N.17(f)(3)

At issue in this case is whether FMB is entitled to bona-fide-purchaser status and therefore protected under the MHOEPA, specifically section 325N.17(f)(3). The MHOEPA regulates "foreclosure reconveyances." A "foreclosure reconveyance" means a transaction involving

(1) the transfer of title to real property by a foreclosed homeowner during a foreclosure proceeding, either by transfer of interest from the foreclosed homeowner or by creation of a mortgage or other lien or encumbrance during the foreclosure process that allows the acquirer to obtain title to the property by redeeming the property as a junior lienholder; and

(2) the subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the foreclosed homeowner by the acquirer or a person acting in participation with the acquirer that allows the foreclosed homeowner to possess either the residence in foreclosure or other real property, which interest includes, but is not limited to, an interest in contract for deed, purchase agreement, option to purchase, or lease.

Minn.Stat. § 325N.10, subd. 3. "Foreclosed homeowner means an owner of residential real property, including a condominium, that is the primary residence of the owner and whose mortgage on the real property is or was in foreclosure." *Id.,* subd. 2. " 'Foreclosure purchaser' means a person that has acted as the acquirer in a foreclosure reconveyance." *Id.,* subd. 4. Foreclosure purchaser "includes a person that has acted in joint venture or joint enterprise with one or more acquirers in a foreclosure reconveyance." *Id.* The parties in this case do not dispute that Graves and his wife were foreclosed homeowners and that REA and C & M were foreclosure purchasers when they entered into the transaction on August 15, 2007.

The dispute in this case is whether FMB is entitled to bona-fide-purchaser status in regard to its purported mortgagee's interest acquired from C & M on September 17, 2007. Bona fide purchasers are afforded protections in section 325N.17(f)(3), which provides that "until the time during which the foreclosed homeowner may cancel the transaction has fully elapsed," a foreclosure purchaser shall not

transfer or encumber or purport to transfer or encumber any interest in the residence in foreclosure to any third party, *provided no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser or encumbrance for value and without notice of a violation of sections 325N.10 to 325N.18, and knowledge on the part of any such person or entity that the property was "residential real property in foreclosure" does not constitute notice of a violation of sections 325N.10 to 325N.18.*

Minn.Stat. § 325N.17(f)(3) (emphasis added). This section further provides that it "does not abrogate any duty of inquiry which exists as to rights or interests of

persons in possession of the residential real property in foreclosure." *Id.*

FMB argues that it is a bona fide purchaser of its mortgagee's interest acquired from C & M. To be protected as a bona fide purchaser under section 325N.17(f)(3), a third party must be a bona fide purchaser of an interest in the residence for value and must be without notice of a violation of the MHOEPA. *Id.* The third party must satisfy any duty of inquiry which exists as to rights or interests of persons in possession of the residential real property in foreclosure. *Id.* We will consider each of these factors in turn.

### A. Bona–Fide–Purchaser Status

Graves argues that FMB is not entitled to bona-fide-purchaser status. FMB had the burden of proving its bona-fide-purchaser status by a preponderance of the evidence. *See MidCountry Bank v. Krueger,* 782 N.W.2d 238, 244 (Minn.2010) (stating that those seeking to be bona fide purchasers have the burden of proving their good-faith-purchaser status); *Miller v. Hennen,* 438 N.W.2d 366, 369 (Minn. 1989) ("The burden is on the party resisting the prior unrecorded title to prove that he purchased or acquired such title in good faith."); *Goette v. Howe,* 232 Minn. 168, 174, 44 N.W.2d 734, 738 (1950) (noting that defendant has an "affirmative burden" of proof in establishing absence of notice); *Errett v. Wheeler,* 109 Minn. 157, 162–63, 123 N.W. 414, 415 (1909) (stating that burden rests on the asserting party throughout the trial and does not shift, even if the prima facie case is presented by the asserting party). Here, FMB affirmatively raised its bona-fide-purchaser status as a defense, and the district court erred by placing on Graves the burden of proving by a preponderance of the evidence that FMB was not a bona fide purchaser when it stated that "[o]n this record, this Court finds nothing that should disqualify [FMB] from its status as a bona fide mortgagee."

"Whether one is a good-faith purchaser is a factual determination that will be sustained unless the reviewing court has a firm and definite impression that a mistake has been made." *Stone v. Jetmar Props., LLC,* 733 N.W.2d 480, 488 (Minn.App.2007). The MHOEPA does not contain a definition of bona fide purchaser. A good-faith purchaser, i.e., bona fide purchaser, "is someone 'who gives consideration in good faith without actual, implied, or constructive notice of inconsistent outstanding rights of others.'" *MidCountry Bank,* 782 N.W.2d at 244 (quoting *Anderson v. Graham Inv. Co.,* 263 N.W.2d 382, 384 (Minn.1978)); *see also Bergstrom v. Johnson,* 111 Minn. 247, 250, 126 N.W. 899, 900 (1910) (noting the requirements for becoming a bona fide purchaser). A "purchaser with actual, implied, or constructive notice of the outstanding rights of others is not entitled to the protection of the Recording Act." *MidCountry Bank,* 782 N.W.2d at 244 (quotation omitted); *see also Ritchie v. Jennings,* 181 Minn. 458, 461, 233 N.W. 20, 21 (1930) (noting the requirements for becoming a bona fide purchaser).

Here, the parties do not dispute that FMB paid valuable consideration for its purported mortgagee's interest in the property; they dispute whether FMB acquired its purported interest in good faith and without notice of the rights of others in the property. In its order of January 18, 2011, and its amended order of April 27, 2011, the district court noted that "[t]o be a bona fide purchaser, [FMB] must take its interest without actual or constructive notice of [the foreclosed homeowners'] rights," and that "[a]ctual possession of real property is constructive notice to all of the possessor's title and rights to property, including all facts connected therewith which a reasonable inquiry would have developed." In its January 18 order, the court found and concluded that

"[FMB] testified it made no inquiry of the [foreclosed homeowners] or their possession of the premises. Had they done so they would have been aware of the [foreclosed homeowners'] interest in the property. Under the circumstances of this case [FMB] is not entitled to the status of bona fide purchaser." But in its April 27 order, the court found and concluded as follows:

> Mr. Blair of [FMB] testified that [FMB] made no inquiry of the [foreclosed homeowners] regarding their possession of the premises. *However, even if they had done so they would have only been made aware of the limited extent of [the foreclosed homeowners'] interest in the property. A title search would have shown that a previous foreclosure had occurred, the redemption period had expired, the property had been redeemed, and that [the foreclosed homeowners] continued to occupy the premises pursuant to a Rent Back Agreement. Under the circumstances of this case, [FMB]'s status would not have been affected by those disclosures. On this record, this Court finds nothing that should disqualify [FMB] from its status as a bona fide mortgagee. Accordingly, the Court declares that [Graves]'s interest in the premises is subject to that of [FMB].*

(Emphasis added.) We now consider whether FMB had notice of Graves's rights in the property.

### 1. Actual Notice

■ "Actual knowledge is generally given directly to, or received personally by, a party." *Wash. Mut. Bank, F.A. v. Elfelt,* 756 N.W.2d 501, 507 (Minn.App.2008) (quotation omitted), *review denied* (Minn. Dec. 16, 2008).

---

■ The parties do not dispute that, at the time of FMB's loan closing with C & M, FMB had a title-insurance commitment, a quitclaim deed signed by the foreclosed homeowners during the foreclosure redemption period, a purchase agreement signed by the foreclosed homeowners during the foreclosure redemption period, and a HUD settlement statement.[3] These documents show that (1) on August 15, 2007, during the foreclosure redemption period, the foreclosed homeowners agreed to sell the property to REA for $182,000 but had the right to remain in possession of the property until October 1, 2007; and (2) on August 15, 2007, during the foreclosure redemption period, the foreclosed homeowners delivered a quitclaim deed to REA. Blair testified that, although FMB knew when it closed the loan that C & M had redeemed the property from foreclosure, it did not "have any information that would indicate that ... Graves may have an inconsistent claim to this property." But Blair also testified that loan officer Guse orchestrated the C & M loan and that Blair did not know whether Guse inquired about any possessors of the property. No record evidence reveals the extent of Guse's knowledge on or before September 17.

FMB is charged with the constructive knowledge of Guse's knowledge. *See SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.,* 795 N.W.2d 855, 866 (Minn.2011) ("[U]nder general corporate law principles, a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent ... acquires ... while acting in the course of employment within the scope of his or her authority." (quotation omitted)). By failing to present evidence about Guse's

---

**3.** Although Graves asserts in his reply brief that FMB "never claimed to lack actual notice of the option to purchase described in the Rent Back Agreement," Blair testified that FMB did not receive the rent-back agreement until after C & M defaulted on its mortgage loan.

knowledge or lack thereof, FMB failed to meet its burden of proving that it was without actual notice of the rights or interests of persons in possession of the residential real property and that it was without actual notice of a violation of the MHOEPA. *See MidCountry Bank,* 782 N.W.2d at 244 (noting that those seeking to be bona fide purchasers have the burden of proving their status).

Based on the record evidence, we conclude that FMB failed to prove that it did not have actual knowledge of Graves's rights in the property.

### 2. Implied Notice

One is not a bona fide purchaser and entitled to the protection of the recording act, though he paid a valuable consideration and did not have actual notice of a prior unrecorded conveyance from the same grantor, if he had knowledge of facts which ought to have put him on an inquiry that would have led to a knowledge of such conveyance.

*Miller,* 438 N.W.2d at 370 (quoting *Henschke v. Christian,* 228 Minn. 142, 146–47, 36 N.W.2d 547, 550 (1949)) (quotation marks omitted).

Implied notice has been found where one has actual knowledge of facts which would put one on further inquiry. For example, if a subsequent purchaser was aware that *someone other than the vendor was living on the land,* the *purchaser would have a duty to inquire* concerning the rights of the inhabitant of the property and would be charged with notice of all facts which such an inquiry would have disclosed.

*Id.* (quotation and citation omitted) (emphasis added); *see also Anderson,* 263 N.W.2d at 384–85; *Konantz v. Stein,* 283 Minn. 33, 42–43, 167 N.W.2d 1, 8 (1969) ("A prospective purchaser dealing with realty in possession of one other than the vendor is bound to make inquiry of the occupant and to ascertain the nature and extent of the occupant's interest. Possession of realty by one other than the vendor is not only prima facie evidence of title in the possessor, but is also notice to a purchaser of whatever rights the possessor has which would be discoverable upon reasonable inquiry." (quotation omitted)); *Flowers v. Germann,* 211 Minn. 412, 419, 1 N.W.2d 424, 428 (1941) ("A party dealing with real estate of which another is in the actual possession, is bound to make inquiries of the occupants, and to ascertain the nature and extent of their interests. The legal presumption is that he will make these inquiries, and he is estopped to deny that he made them." (quotations omitted)); *Hauger v. J.P. Rodgers Land Co.,* 156 Minn. 45, 49, 194 N.W. 95, 97 (1923) ("Actual possession of real property is notice to all the world of the title and rights of the person in possession. Also of all facts connected therewith which reasonable inquiry would disclose, and a purchaser thereof, knowing the possession to be in a third person, is chargeable with notice of such facts."); *Ludowese v. Amidon,* 124 Minn. 288, 294, 144 N.W. 965, 968 (1914) (stating broadly that "possession is notice to purchasers of land of the possessor's rights therein"); *Teal v. Scandinavian–Am. Bank,* 114 Minn. 435, 441, 131 N.W. 486, 488 (1911) (noting that plaintiff's actual possession of property "was notice to all the world of his rights"); *Lindberg v. Fasching, M.D.,* 667 N.W.2d 481, 486 (Minn.App.2003) (citing *Farmers' State Bank v. Cunningham,* 182 Minn. 244, 246, 234 N.W. 320, 321 (1931)), *review denied* (Minn. Nov. 18, 2003); *Claflin v. Commercial State Bank of Two Harbors,* 487 N.W.2d 242, 248 (Minn.App.1992) ("In Minnesota, clear, actual, exclusive possession of the granted premises by the grantor, even after delivery and recording of the deed, is notice against purchasers and mortgagees of the grantor's possible inter-

est in the property."), *review denied* (Minn. Aug. 4, 1992).

 We have already concluded that FMB failed to prove that it did not have actual knowledge of the foreclosed home-owners' possession, and FMB therefore had a duty to inquire. FMB appears to argue that it fulfilled its duty of inquiry by relying on initials which appear next to each item listed on Schedule B—Section II of the title commitment. Blair testified that "where it's been initialed off . . . all these matters had been addressed at the time of the closing of the loan." He also testified that although "we review the documents, we rely heavily on the opinions of the title company." But the title commitment, dated March 31, 2007, almost six months before the loan closing, contains information that is inconsistent with other information in FMB's possession at the time of closing. For example, Schedule A of the commitment states, "Fee Simple interest in the land described in this Commitment is owned, *at the Commitment Date,* by REA Group, Inc." (Emphasis added.) But REA did not own the property on March 31, 2007; the foreclosed homeowners delivered their quitclaim deed to REA on August 15, 2007, and that is the date of the quitclaim deed that was in FMB's possession at the time of the loan closing.

We reject FMB's argument that it fulfilled its duty of inquiry by relying on initials contained on a title insurance commitment that was almost six months old at the time of the loan closing and contained information inconsistent with other information that FMB possessed. *See generally Claflin,* 487 N.W.2d at 245, 248–49 (noting that purchaser had implied notice when he knew individual was living on property, he received title opinion, and he ignored title-opinion provision that excepted the rights of occupants).

 We conclude that FMB did not satisfy its duty to inquire. *See Miller,* 438 N.W.2d at 370 (noting that once a party has actual notice "that someone other than the vendor was living on the land," it had "a duty to inquire concerning the rights of the inhabitant of the property"). FMB is therefore "charged with notice of all facts which such an inquiry would have disclosed." *Id.* Such an inquiry would have disclosed that the foreclosed homeowners had canceled their transaction with REA and C & M.

Because FMB had actual and implied notice of the foreclosed homeowners' interest in the property, we are left with a firm and definite impression that the district court made a mistake in its order of April 27, 2011, when it concluded that "nothing . . . should disqualify [FMB] from its status as a bona fide mortgagee," and in its declaration that Graves's interest is subject to the interest of FMB. Furthermore, we conclude that FMB is not entitled to bona-fide-purchaser status. In consideration of our conclusion that FMB had actual and implied notice of the foreclosed homeowners' interest in the property, we need not consider whether FMB had constructive notice.

### B. FMB'S Notice of Violations of the MHOEPA

Graves also argues that FMB had notice of violations of the MHOEPA. We agree.

 To avail itself of the protection to bona fide purchasers under section 325N.17(f)(3) of the MHOEPA, a third party must receive an interest in a property "without notice of a violation of sections 325N.10 to 325N.18." Minn.Stat. § 325N.17(f)(3). We begin our analysis of Graves's argument with a conclusion that, as with bona-fide-purchaser status, a third party has the burden of proving that it received its interest in a property without

notice of a violation of the MHOEPA. *See MidCountry Bank,* 782 N.W.2d at 244 (noting that burden of proving bona-fide-purchaser status is on party seeking to show it is a bona fide purchaser). We also begin our analysis by recognizing that "knowledge on the part of any such person or entity that the property was residential real property in foreclosure does not constitute notice of a violation of sections 325N.10 to 325N.18." Minn.Stat. § 325N.17(f)(3).

■■■■■ FMB presented no evidence of what Guse, its loan officer, knew about the transaction between the foreclosed homeowners and REA and C & M or what inquiries he made. But, as found by the district court in its January 18, 2007 order, in providing the loan to C & M on September 17, "there was no justifiable or excusable mistake of fact involved. [FMB] knew the transaction involved a foreclosure reconveyance and received a copy of the Purchase Agreement." Although the court left out this finding in its amended order of April 27, 2011, the finding is supported by substantial evidence in the record. Yet, as noted in the court's order of April 27, "Blair of [FMB] testified that [FMB] made no inquiry of the Graves regarding their possession of the premises." Under the circumstances in this case, FMB had a duty of further inquiry and failed to fulfill that duty, knowing that its customer, C & M, was in the business of purchasing properties out of foreclosure. *See Stone,* 733 N.W.2d at 489 (noting that a purchaser "failed to make adequate inquiries about the property" when the circumstances of the underlying transaction were unusual). FMB is chargeable with all facts that a reasonable inquiry would have disclosed. *Hauger,* 156 Minn. at 49, 194 N.W. at 97. "A failure to make inquiry may be regarded as an intentional avoidance of the truth which it would have disclosed." *Ludowese,* 124 Minn. at 295, 144 N.W. at 968–69 (quotation omitted).

The court erred when it speculated, stating:

However, even if [FMB] had [inquired, it] would have only been made aware of the limited extent of [the foreclosed homeowners'] interest in the property. A title search would have shown that a previous foreclosure had occurred, the redemption period had expired, the property had been redeemed, and that Graves continued to occupy the premises pursuant to a Rent Back Agreement. Under the circumstances of this case [FMB]'s status would not have been affected by those disclosures.

■■■■ Under the rule announced in *Teal,* the court will "not speculate … upon what might happen or be discovered if inquiry were made, but will presume, in the absence of evidence conclusively showing the contrary, that upon inquiry the true situation and claims of the possessor would be made known." 114 Minn. at 442, 131 N.W. at 488. Under *Teal,* we must assume that, upon inquiry by FMB, the true situation and claims of the foreclosed homeowners would have been made known. *See id.* at 441, 131 N.W. at 488.

■■■■ Here, as in *Teal,* the evidence does not sustain the claim that FMB's inquiry of Graves would not have brought to light the truth or the rights now asserted by Graves. *Id.* The evidence shows that the foreclosed homeowners entered into a foreclosure reconveyance that violated multiple provisions of the MHOEPA. *See, e.g.,* Minn.Stat. §§ 325N.11 (requiring that every foreclosure-reconveyance contract be fully completed and signed and dated by the foreclosed homeowner and foreclosure purchaser before the execution of any instrument of conveyance of the residence in foreclosure), .12 (requiring certain foreclosure-reconveyance contract terms, including, but not limited to, a notice of cancellation, and that the contract

"contain the entire agreement of the parties"), .13 (providing that, in addition to any other right of rescission, a foreclosed homeowner has the right to cancel any contract with a foreclosure purchaser until midnight of the fifth business day following the day on which the foreclosed homeowner signs a contract that complies with sections 325N.10–.15 or until 8:00 a.m. on the last day of the period during the homeowner's redemption period, whichever occurs first; and requiring foreclosure purchaser to return all documents to foreclosed homeowner within ten days following receipt of notice of cancellation), .14 (requiring that notice of cancellation contain conspicuous statement with certain language in size equal to at least 14–point boldface type and in capital letters, if typed, and that the language must be contained in contract "in immediate proximity to the space reserved for the foreclosed homeowner's signature"), .17 (listing various prohibited practices).

The law charged FMB with knowledge of the MHOEPA. *See Albrecht v. Sell,* 260 Minn. 566, 569–70, 110 N.W.2d 895, 897 (1961) ("[U]nder well-established principles of law [parties] are conclusively presumed to be aware of existing statutes...."). Therefore, under *Teal,* we conclude that FMB had implied notice of violations of the MHOEPA. We also conclude that FMB failed to prove that it did not have actual knowledge of violations of the MHOEPA.

### C. Even if FMB Is a Bona Fide Purchaser, FMB Has No Interest in the Property

"[T]he bona-fide-purchaser doctrine should not apply to create a title to land when there is a total absence of title in the vendor." *Hanson v. Woolston,* 701 N.W.2d 257, 267 (Minn.App.2005) (noting that bona-fide-purchaser defense does not apply when transfer is based on void judgment), *review denied* (Minn. Oct. 18,

2005); *see Stone,* 733 N.W.2d at 488 (noting that, under Minnesota Recording Act (Minn.Stat. § 507.34), buyer was not a bona fide purchaser because quitclaim deed that purportedly transferred interest was void).

In both the January 18, 2011 order and April 27, 2011 amended order, the district court concluded that the foreclosed homeowners had exercised their right of cancellation. The court concluded that "REA had no interest in the Property after rescission and had nothing to convey to C & M" and declared the quitclaim deed and the other contracts void. FMB erroneously states in its brief that the foreclosed homeowners *"purportedly* cancel[ed] the transaction with the Wayman [E]ntities." (Emphasis added.) The district court declared the transaction between the foreclosed homeowners, REA, and C & M void. The foreclosed homeowners' cancellation of the quitclaim deed and other documents is real, not purported. And FMB did not file a notice of related appeal to challenge the district court's conclusion. *See* Minn. R. Civ.App. P. 103.02, subd. 2, 104.01, subd. 4, 106; *In re Estate of Barg,* 752 N.W.2d 52, 74 (Minn.2008) (stating that respondent's failure to file a notice of review under the predecessor to the current rules governing a notice of related appeal waives review of that issue in the court of appeals).

We conclude that C & M had no interest in the property after cancellation and therefore had nothing to convey to FMB. FMB has no interest in the property. While this result may seem harsh, we note that FMB is a professional lender charged with knowing the MHOEPA, the law that governs the business of its customer in this case, C & M. FMB is not an unsophisticated individual who made a justifiable or excusable mistake.

## II. Common–Law Fraud

Graves argues that the district court erred by denying his common-law-fraud claim against the Waymans, REA, and C & M. Although this appeal is stayed as to Michael Wayman and Cori Wayman due to their bankruptcy filing, it is not stayed as to REA and C & M. *Graves,* No. A11–1521. We therefore review the district court's denial of Graves's common-law-fraud claim against REA and C & M.

 To establish common-law fraud, Graves must prove

> (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance.

*U.S. Bank N.A. v. Cold Spring Granite Co.,* 802 N.W.2d 363, 373 (Minn.2011). "To prevail on a claim of fraudulent misrepresentation, the complaining party must set forth evidence demonstrating both actual and reasonable reliance." *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.,* 736 N.W.2d 313, 320–21 (Minn.2007). Whether reliance is reasonable is a question of fact. *Id.* at 321.

> [A] party can reasonably rely on a representation unless the falsity of the representation is known or obvious to the listener. The listener is not under an obligation to conduct an investigation and thus may rely on the representation so long as it is not known by the listener to be false and is not obviously false.

*Id.* (citation omitted). Moreover, "[r]eliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." *Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 369 (Minn.2009); *see Hollerman v. F.H. Peavey & Co.,* 269 Minn. 221, 229, 130 N.W.2d 534, 540 (1964) ("Because of their ignorance and inexperience in regard to matters concerning which material representations were made, plaintiffs had a right to rely upon the superior knowledge of defendants.").

 Here, the district court determined that (1) within the scope of his employment with REA and C & M, Michael Wayman made false representations about the amount of time the foreclosed homeowners had to rescind and about the transaction involving a mortgage; (2) Michael Wayman "assured [the foreclosed homeowners] that the transaction was not a sale of their house," when, in fact, Michael Wayman induced the foreclosed homeowners to sign the quitclaim deed in favor of REA; (3) Michael Wayman gave the foreclosed homeowners the quitclaim deed, rent-back agreement, and purchase agreement for their signature immediately after telling them that he was a real estate agent who had helped other families escape foreclosure and that he could "save the property"; (4) the foreclosed homeowners signed all the documents that Michael Wayman gave them; and (5) the foreclosed homeowners "lost ownership of the Property prematurely and unnecessarily" and incurred a rent obligation under the rent-back agreement.

The district court denied Graves's fraud claim after determining that Graves failed to prove that he and his wife reasonably relied on Michael Wayman's representations because they attempted to cancel the transaction within 24 hours after entering into it. But, inconsistent with the court's determination, the court credited Graves's testimony that he and his wife were "unsophisticated in real estate matters" and that the property "was the first and only real property owned by them." And nothing

on the record shows that the foreclosed homeowners knew about the falsity of Wayman's representations or that the representations were obviously false. We therefore conclude that the court's finding that the homeowners did not reasonably rely on Wayman's representations is erroneous.

## DECISION

Because FMB was not a bona fide purchaser, it is not entitled to bona-fide-purchaser protection under section 325N.17(f)(3), and we therefore reverse the district court's April 27, 2011 order insofar as it declares FMB a bona fide purchaser and awards Graves the property subject to FMB's interest. Accordingly, we reverse the district court's June 15, 2011 order that awards FMB the property, free and clear of any encumbrances of other parties; and we reinstate the January 18, 2011 order insofar as it awards to Graves title to the property, free of the interest of any defendant. We also reverse the district court's April 27, 2011 order insofar as it denies Graves's common-law-fraud claim against REA and C & M. We remand to the district court for entry of judgment consistent with this opinion.

**Reversed and remanded.**