OPINION
STRAS, Justice.
This case arises out of the distressed real estate market of the past decade. When respondent Amos Graves was on the verge of losing his home to foreclosure, Michael Wayman persuaded Graves to enter into a transaction that would purportedly save his home. The transaction required Graves to execute a quitclaim deed in favor of a corporate entity under Way-man’s control. The day after Graves executed the deed, he sent a timely cancellation notice, as was his statutory right, to Wayman, who refused to cancel the transaction. The eventual mortgagee of the property, appellant First Minnesota Bank, sought ownership of the home in foreclosure when Wayman ceased making mortgage payments. The district court awarded the property to First Minnesota based on the bank’s status as a bona fide purchaser, but the court of appeals reversed and awarded the property to Graves free of any interest of the bank. For the reasons that follow, we affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.
I.
Amos Graves and his late wife bought a home in Saint Paul in 1999. Graves fell behind on his mortgage payments in early 2007, and his mortgage lender, Wells Fargo Bank, foreclosed on the home. Wells Fargo purchased the home at a sheriffs sale on March 13, 2007, which meant that Graves had 6 months, or until September 13, 2007, to redeem the home. See Minn. Stat. § 580.23, subd. 1(a) (2014) (providing a mortgagor with 6 months to redeem a property following a foreclosure sale).
During the redemption period, Michael Wayman contacted Graves and offered to help Graves save his home. On August 15, 2007, Wayman met with Graves, who executed a quitclaim deed purporting to transfer the home to REA Group, a company controlled by Wayman. In return, Way-man signed a purchase agreement on behalf of C&M Real Estate Services Group, another of Wayman’s companies, which agreed to pay $182,000 to Graves. Graves and Wayman also executed a “residential lease” and a “rent-back agreement” that obligated Graves to pay $1,302 per month to C&M. The rent-back agreement stated that Graves could “purchase the home back for the amount df $170,000” within 6 months. Wayman provided Graves with a form containing the following caption: “Cancellation of Contract Notice.” The cancellation form notified Graves that he could cancel the transaction, “without any penalty or obligation, within three business days.”
After the meeting with Wayman, Graves changed his mind about the transaction. *794 He signed and dated the cancellation form later that same night, and mailed it to Wayman the next day. Wayman responded by telling Graves that he would not honor the cancellation because, according to Wayman — and contrary to the undisputed facts — Graves did not timely execute the cancellation form. •
On September 5, 2007, Wayman recorded the quitclaim deed that Graves had given him at the August 15 meeting. On September 11, 2007 — -just 2 days before the expiration of the redemption period for the March 2007 sheriffs sale — Wayman took steps to redeem the property through C&M. Specifically, Wayman had REA (which purportedly held title under the quitclaim deed) grant and record a $100 mortgage to C&M. C&M then filed and recorded a notice of intent to redeem Graves’s home as a junior creditor.
To carry out the redemption, C&M borrowed $145,000 from First Minnesota Bank and purportedly granted a mortgage to First Minnesota on Graves’s home to secure the loan. Wayman faxed the quitclaim deed and the purchase agreement to First Minnesota on September 13, 2007, and the loan closed 4 days later. Of the loan proceeds, roughly $110,000 went to the Ramsey County Sheriff to redeem the property. Approximately $80,500 was supposed to go to Graves, but he never received that money. Graves also never received any part of the $182,000 that Wayman and C&M owed him under the purchase agreement. Nevertheless, Graves continued to live in the home and, for whatever reason, pay $1,302 per month to C&M through mid-2009.
At some point in 2008, Wayman and C&M defaulted on the loan from First Minnesota. In October 2008, First Minnesota sued Wayman, C&M, and REA in Ramsey County District Court to foreclose its mortgage. Graves was not a party to that action. In May 2009, the district court granted summary judgment to First Minnesota and entered an order of foreclosure. Based on that order, the sheriff conducted a second foreclosure sale in August 2009, and First Minnesota bought Graves’s home for $145,000. The district court subsequently entered an order confirming the sale, and the redemption period for that sale expired in February 2010.
Graves brought this action against Way-man, his companies, and First Minnesota in June 2009, shortly after First Minnesota prevailed in the foreclosure action. Graves’s amended complaint included 13 separately labeled counts alleging common-law claims as well as violations of Minnesota’s Home Ownership and Equity Protection Act (“MHOEPA”),[1] see Minn. Stat. §§ 325N.10-.18 (2014); federal lending laws; and various consumer-protection statutes. Graves’s kitchen-sink complaint boiled down to two principal theories.
First, Graves argued that he did not lawfully sell his home to Wayman in August 2007, and that First Minnesota’s mortgage was therefore invalid. To support his argument, he contended that the August 2007 transaction with Wayman was “in fact an equitable mortgage.” He also *795 asked that the transaction be declared “void” under Minn.Stat. § 334.05 (2014), which governs usurious contracts, and MHOEPA. And he requested that the transaction, “[i]f voidable,” be “rescind[ed]” under the Truth in Lending Act, 15 U.S.C. §§ 1601-67Í (2012); under Minn. Stat. § 8.31 (2014) (a provision authorizing the Attorney General to investigate and punish consumer fraud); under Minn.Stat. § 325N.13 (a provision granting a cancellation right to foreclosed homeowners under MHOEPA); or “as equitable relief under the Minnesota Prevention of Consumer Fraud Act and common law fraud.”
Second, Graves argued that, even if he did lawfully sell his home to Wayman in August 2007, he retained a “vendor’s lien” on the property that was superior to First Minnesota’s mortgage. Under that theory, Graves argued that he was owed roughly $71,000 in proceeds from the sale to Wayman and that he should be entitled to foreclose on his lien and then sell the property to satisfy the outstanding debt.
The district court held a 1-day bench trial. Before the trial, the district court ordered Graves to pick a single theory of the case for trial. Under protest, Graves agreed to proceed on the theory that “the transaction in question was a sale, rather than a mortgage.” During and after the bench trial, however, Graves shifted his focus to his arguments under MHOEPA— arguments that have no clear connection to the theory that the transaction was a sale that gave rise to a vendor’s lien.
At trial, Graves’s counsel elicited testimony about the cancellation notice and asserted that the effect of the cancellation should be determined under MHOEPA. In a written closing argument submitted to the district court after the bench trial, Graves argued both that the transaction was void at the outset and that Graves had cancelled the transaction “[wjhether by statutory right or contract right.” Specifically, Graves stated:
[T]he transaction was far from compliant with §§ 325N.il-.14 and was void. To be sure, transactions that are contrary to public policy or .law are illegal, void and null. The deed conveyed nothing and neither could the subsequent mortgages.
Even if the transaction were valid, [Graves] elected to cancel the transaction that evening. The following day, [Graves] also mailed [his] signed Notice of Contract Cancellation to Mr. Wayman at the address indicated on the form. A void transaction cannot be ratified.
Graves framed his vendor’s-lien argument as an alternative to his argument that the transaction was void.
The district court issued the first of three orders for judgment in January 2011. In a January 2011 order, the court found that, “whether by contractual or statutory right, [Graves] exercised [his] right of rescission” with respect to the August 15, 2007, transaction. The court also declared “the contracts in this case” to be “void as against public policy.” Accordingly, the court held that the August 15, 2007, quitclaim deed did not convey any interest to REA, and that REA therefore “had nothing to convey to C&M” when REA ostensibly granted a mortgage on the property to C&M. The court awarded damages to Graves to be “secured by a-‘vendor’s lien’ on the real property.”
With respect. to First Minnesota, the district court found that it was not a bona fide purchaser because it had “made no inquiry of [Graves] or [his] possession of the premises.” The court therefore held that Graves’s “rights in the Property, whether via Minn.Stat. §§ 325N.10-.18, common law fraud and/or a vendor’s lien” were superior to First Minnesota’s mortgage. The court awarded title to the home *796 to Graves “free of the interest of any Defendant.” Yet the district court also— inconsistently — declared Graves’s “vendor’s lien” to be “superior to that of First Minnesota.” It is not clear whether the district court meant to say that First Minnesota had no interest in the property at all, or that First Minnesota had an interest that was subordinate to Graves’s interest.
In any event, after a post-judgment motion by First Minnesota, the district court changed its mind and entered a second order for judgment in April 2011. With respect to the August 15, 2007, transaction, the court again said that the contracts in the case were void (though it now said that Graves had exercised a right of “cancellation” rather than, as in the previous order, a right of “rescission”). The court also again held that the August 15, 2007, quitclaim deed did not convey any interest to REA and that REA therefore “had nothing to convey to C&M” when it ostensibly granted a mortgage on the property. The court awarded damages to Graves but did not award him a vendor’s lien.
With respect to First Minnesota, however, the district court reversed course and held that First Minnesota was a bona fide mortgagee. The court stood by its factual finding that First Minnesota did not make any inquiry of Graves about his possession of the home, but the court then determined, in tension with its first order, that “even if [First Minnesota] had done so [it] would have only been made aware of the limited extent of Gravesfs] interest in the property.” Accordingly, the court concluded that “[o]n this record, this Court finds nothing that should disqualify First Minnesota from its status as a bona fide mortgagee” and declared that Graves’s “interest in the premises” — whatever that might be — was “subject to that of First Minnesota.”
The district court entered a third order for judgment in June 2011 after additional post-judgment briefing. It appears that the district court intended its third order, which is two pages, to supplement the second order rather than to replace it. In the third order, the district court concluded that, because First Minnesota had purchased the property at the August 2009 sheriffs sale and the redemption period had expired, First Minnesota owned the house “free and clear of any encumbrances of other parties.”
Graves appealed, and the court of appeals reversed. Graves v. Wayman, 816 N.W.2d 655 (Minn.App.2012). The court of appeals ruled in favor of Graves on two separate theories. Under the first theory, the court of appeals concluded that First Minnesota was not a bona fide purchaser. Id. at 667. The court of appeals rejected the district court’s speculation that, had First Minnesota inquired further into the transaction between Wayman and Graves, it would have learned nothing more than “ ‘the limited extent’ ” of Graves’s interest in the property. Id. at 668 (quoting the district court order). Instead, according to the court of appeals, First Minnesota should have inquired further because the documents in its possession provided implied notice of Graves’s competing interest in the property — that is, had First Minnesota made further inquiries, it would have discovered that Graves had cancelled the transaction with Wayman and his companies. Id. at 667. The court of appeals also held that First Minnesota had implied notice that Wayman and his companies had violated MHOEPA, and that First Minnesota had failed to prove that it lacked actual knowledge of the MHOEPA violations. Id. at 669. Based on First Minnesota’s failure to call the loan officer who conducted the transaction to testify at trial or to present any other evidence that it *797 was without actual notice of Graves’s competing claim to the property, the court of appeals concluded that First Minnesota did not qualify as a bona fide purchaser. Id. at 665-66.
Alternatively, the court of appeals held that Graves’s cancellation of the transaction with Wayman was “real, not purported,” and that, as a result, “C&M had no interest ... to convey” to First Minnesota. Id. at 669. The court of appeals’ second theory was independent of its first because, according to the court, Graves’s cancellation of the August 15, 2007 transaction resulted in no interest for C&M to convey to First Minnesota, regardless of whether First Minnesota was a bona fide purchaser. See id. Based on these two theories, the court of appeals reversed the district court’s second and third orders and directed that the first order, which awarded the property to Graves free of any other interests, be reinstated. Id. at 671. We granted First Minnesota’s petition for review.
II.
The Legislature enacted MHOEPA in 2004 to regulate foreclosure reconvey-ances, Act of May 28, 2004, ch. 263, §§ 1— 18, 2004 Minn. Laws. 953, 953-67 (codified at Minn.Stat. §§ 325N.01 — .18), which are transactions that target homeowners whose homes are in foreclosure. In general, such transactions, sometimes called “foreclosure rescue scams,” target homeowners who are in financial distress and have substantial equity in their homes. See Proctor v. Metro. Money Store Corp., 645 F.Supp.2d 464, 471 (D.Md.2009). The foreclosure purchaser obtains title from the homeowner, pays off the balance owed on the mortgage, and then agrees to allow the homeowner to remain in the home through a leaseback arrangement or a contract for deed. See Johnson v. Wheeler, 492 F.Supp.2d 492, 495-96 (D.Md.2007). When the homeowner fails to make the payments — usually because the terms of the arrangement are unreasonable — the purchaser is able to evict the homeowner and keep the equity that the homeowner had in the home prior to the transaction. See Brovm v. Grant Holding, LLC, 394 F.Supp.2d 1090,1094-95 (D.Minn.2005).
These types of equity-stripping transactions qualify as “foreclosure reconveyance[s]” under MHOEPA because they (1) “transfer ... title to real property by a foreclosed homeowner during a foreclosure proceeding”; and (2) involve a “subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the foreclosed homeowner.” Minn.Stat. § 325N.10, subd. 3. The party who enters into such a transaction with the foreclosed homeowner is a “foreclosure purchaser.” Minn.Stat. § 325N.10, subd. 4.[2]
No one disputes that the transaction between Wayman and Graves constituted a “foreclosure reconveyance,” or that Way-man and his corporate entities were “foreclosure purehaser[s]” under MHOEPA. Nor is there any dispute that Wayman and his entities violated MHOEPA in multiple ways. The outcome of this case, however, does not turn on the MHOEPA violations. Rather, it turns on the legal effect of Graves’s timely cancellation of the transaction — that is, whether, after Graves can-celled the transaction, First Minnesota could have obtained rights to the property *798 as a bona fide purchaser without knowledge of the MHOEPA violations. Based on the statutory scheme, we conclude that Graves’s timely cancellation left Wayman and his corporate entities with no interest to convey and that, therefore, First Minnesota did not obtain any rights in the property as a bona fide purchaser under MHOEPA.
A.
Graves’s cancellation theory resolves this case, so we focus our attention on MHOEPA’s text, which is the basis for that theory.[3] Interpretation of a statute presents a question of law that we review de novo. E.g., In re Estate of Butler, 803 N.W.2d 393, 397 (Minn.2011). When a statute is clear and unambiguous, we apply the statute’s plain meaning and interpret the words and phrases in the statute according to their plain and ordinary meanings. Cnty. of Dakota v. Cameron, 839 N.W.2d 700, 705 (Minn.2013).
1.
Under MHOEPA, a foreclosed' homeowner “has the right to cancel any contract with a foreclosure purchaser” until the earlier of (1) midnight of the fifth business day after signing a contract that complies with MHOEPA, or (2) the end of the foreclosed homeowner’s redemption period. Minn.Stat. § 325N.13(a). Cancellation is “effective upon mailing” and “occurs when the foreclosed homeowner delivers, by any means, written notice of cancellation.” Minn.Stat. § 325N.13(b). The cancellation right is “[i]n addition to any other right of rescission” available to the foreclosed homeowner. Id. § 325N.13(a). In this case, the district court concluded that Graves exercised his “right of cancellation” when he timely mailed the cancellation notice to Wayman.[4]
The key issue presented by this case is the legal effect of a timely cancellation of a transaction under MHOEPA. Graves argues that, because he timely exercised his right to cancel the transaction, First Minnesota cannot take any interest in the property regardless of whether it qualifies as a bona fide purchaser. According to Graves, the timely cancellation rendered the quitclaim deed void, which left C&M with no interest to convey to First Minnesota. First Minnesota acknowledges that “[t]he general rule, in a standard transaction, is that neither the Recording Act nor the common law bona fide purchaser de *799 fense will protect a mortgagee if the mortgagor held no interest in the property.” It nevertheless maintains that MHOEPA provides additional rights to a bona fide purchaser in a foreclosure-reconveyance transaction.
MHOEPA provides a right to the foreclosed homeowner to “cancel” the transaction with the foreclosure purchaser, but does not define the word “cancellation” or explicitly describe the legal effect of a cancellation. The plain and ordinary meaning of “cancel” is “[t]o annul or invalidate.” The American Heritage Dictionary of the English Language 270 (5th ed.2011); see also id. at 73 (defining the word “annul” to mean, “to ... declare void or invalid” (emphasis added));' Black’s Law Dictionary 247 (10th ed.2014) (defining “cancellation” as “[a]n annulment or termination of a promise or an obligation”). The statute as a whole indicates that MHOEPA uses the word “cancellation” in various provisions, including section 325N.13, to refer to the foreclosed homeowner’s right to invalidate or rescind the transaction with the foreclosure purchaser. For example, MHOEPA describes cancellation as a remedy “[i]n addition to any other right of rescission,” Minn.Stat. § 325N.13(a) (emphasis added), which indicates that the act of cancellation itself is a form of rescission under MHOEPA. Indeed, MHOEPA’s treatment of cancellation as a form of rescission is consistent with general principles of equity and our case law, which describes “ ‘[t]he equitable remedies of cancellation, rescission, surrender up, and discharge of instruments [as] one and the same remedy, depending upon the same rules.’ ” Chilstrom v. En-wall, 168 Minn. 293, 295, 210 N.W. 42, 43 (1926) (quoting 2 Pomeroy, Equity Jurisprudence-% 684).
“Rescission” is “the unmaking or abrogation of a contract.” Abdallah, Inc. v. Martin, 242 Minn. 416, 420, 423, 65 N.W.2d 641, 644, 646 (1954) (“[T]o rescind a contract is not merely to terminate it but to abrogate it and undo it from the beginning.” (citing 1 Black, Rescission and Cancellation § 1 (2d ed.))). In the real estate context, we have said that “[r]escission annihilates the contract, and, after a binding election to rescind, each party is returned to his previously existing rights.” Brown v. Cal. & W. Land Co., 145 Minn. 432, 436, 177 N.W. 774, 776 (1920) (emphasis added). Thus, “[t]he effect of the remedy of rescission is generally to extinguish a rescinded contract so effectively that in contemplation of law it has never had existence.” Chase Manhattan Bank, N.A. v. Clusiau Sales & Rental, Inc., 308 N.W.2d 490, 494 (Minn.1981). Accordingly, Graves’s timely cancellation was the statutory equivalent of rescission, which rendered void all of the instruments — including the quitclaim deed that Wayman and his entities obtained from Graves in the foreclosure-reconveyance transaction — and returned each of thé parties to their “previously existing rights.” See Brown, 145 Minn, at 436, 177 N.W. at 776; see also Cooper v. Finke, 38 Minn. 2, 7, 35 N.W. 469, 471 (1887) (explaining that a void instrument is an instrument that “never had any legal existence or binding force”).
• Our interpretation of MHOEPA also is consistent with the common-law delivery requirement. See Slawik v. Loseth, 207 Minn. 137, 139, 290 N.W. 228, 229 (1940) (“It is of course elementary that delivery of a deed is essential to a transfer of title.”). As we have stated, “delivery of a deed is complete only when the grantor has put it beyond, his power to revoke or reclaim it,”-Babbitt v. Bennett, 68 Minn. 260, 263, 71 N.W. 22, 22 (1897) (emphasis added), and an undelivered deed cannot-transfer legal title, even to a bona fide .purchaser, because lack of delivery ren *800 ders the deed void, see White & St. Townsite Co. v. J. Neils Lumber Co., 100 Minn. 16, 22, 110 N.W. 371, 374 (1907).
In this case, although Graves physically-transferred a quitclaim deed to Wayman, delivery did not occur because Graves never put the deed “beyond his power to revoke or reclaim it.” See Babbitt, 68 Minn, at 263, 71 N.W. at 22. Instead, Graves retained the power to revoke or reclaim the deed during the statutory cancellation period under Minn.Stat. § 325N.13(a)-(b), which made delivery impossible during the cancellation period. Nor did Graves have the intent to convey title at the conclusion of the cancellation period, because he had already cancelled the transaction. Accordingly, without delivery of the deed to Wayman, the common law treats the quitclaim deed as void. See White & St. Townsite Co., 100 Minn. at 22, 110 N.W. at 374.
Whether analyzed in terms of delivery or rescission, other provisions of MHOE-PA reinforce our conclusion that a homeowner’s timely notice of cancellation invalidates — that is, renders void — a deed obtained by the foreclosure purchaser. For example, under section 325N.14(a), a contract between a foreclosure purchaser and a homeowner must contain “a conspicuous statement” informing the homeowner of the right to “cancel this contract for the sale of [his or her] house without any penalty or obligation ” before the end of the cancellation period. Minn.Stat. § 325N.14(a) (emphasis added); see also Minn.Stat. § 325N.14(b) (requiring the same statement in the notiee-of-cancellation form provided to the homeowner). Section 325N.14(a) demonstrates the Legislature’s intent to return the homeowner to the same position as before the transaction with the foreclosure purchaser, which is identical to how rescission operates. See Brown, 145 Minn. 432, 436, 177 N.W. 774, 776 (stating that rescission returns each party “to his previously existing rights”). Moreover, section 325N.13(d) requires a foreclosure purchaser who receives a cancellation notice to “return without condition any original contract and any other documents signed by the foreclosed homeowner,” Minn.Stat. § 325N.13(d) (emphasis added), which provides support for the theory that, under MHOEPA, Graves could not have delivered the deed to Wayman or his entities before the cancellation period had expired. In fact, far from “abrogating] the common-law delivery rule,” as the dissent claims, MHOE-PA is consistent with the common-law delivery rule by requiring a foreclosure purchaser to both notify a homeowner of the right to cancel the transaction “without any penalty or obligation” and to return, “without condition,” all of the documents (including the deed) signed by a homeowner once cancellation occurs. Minn.Stat. §§ 325N.13(d), .14(a); see Shaw Acquisition Co. v. Bank of Elk River, 639 N.W.2d 873, 877-78 (Minn. 2002) (explaining in a mortgage-foreclosure case that courts must presume that a statute is consistent with the common law, and that, if a statute abrogates the common law, it must do so by express wording or necessary implication). Finally, Minn.Stat. § 325N.17(f)(2) expressly forbids a foreclosure purchaser from taking any steps during the cancellation period to transfer a homeowner’s interest in the property, including recording or filing any documents signed by the homeowner. These provisions collectively signal the Legislature’s clear intent that a cancelled foreclosure-reconveyance transaction is a legal nullity.
In this case, the cancellation of the foreclosure reconveyance became “effective” and “occur[red]” on August 16, 2007, when Graves mailed the notice of cancellation to *801 Wayman. Minn.Stat. § 325N.13(b). The dissent does not dispute that “Graves satisfied the requirements for cancellation of the foreclosure reconveyance under section 325N.13.” But the dissent then proceeds to interpret a different statute than the one the Legislature actually enacted. Specifically, the dissent faults Graves for failing to record his cancellation . notice — a requirement that is nowhere to be found in MHOEPA and is contrary to the statute, which says that “cancellation” becomes “effective” and “occurs” when a homeowner mails notice of the cancellation to the foreclosure purchaser. Id. Instead of creating a novel recording requirement, we simply follow the plain language of the statute and conclude that Graves’s cancellation became “effective” and “occur[red],” even as to third parties, when Graves mailed his written cancellation notice to Wayman.
2.
First Minnesota does not dispute that Wayman and his entities lacked a legal interest in the property following Graves’s cancellation, but claims that it nevertheless has rights in the property as a bona fide purchaser. We disagree.
The bona-fide-purchaser doctrine is a venerable common-law rule of real estate law, see Leqve v. Smith, 63 Minn. 24, 28, 65 N.W. 121, 123 (1895) (Mitchell, J., concurring), that is codified in Minnesota’s Recording Act, Minn.Stat. § 507.34 (2014). The Recording Act “serves to protect bona fide purchasers who purchase a property in good faith and lack notice of others’ outstanding rights to the property.” Bruggeman v. Jerry’s Enters., Inc., 591 N.W.2d 705, 710-11 (Minn.1999). Here, First Minnesota claims that it is a bona fide purchaser because it paid valuable consideration for the mortgage in reliance on the quitclaim deed recorded by REA and lacked notice of either Graves’s competing rights to the property or the MHOEPA violations.
Although the bona-fide-purchaser doctrine provides substantial protections against adverse claims when there is no record notice of a prior inconsistent interest, a bona fide purchaser cannot acquire an interest in property when the grantor’s underlying deed is void. See generally Caryl A. Yzenbaard, Residential Real Estate Transactions § 6:25 n. 47 (2005) (explaining that a void deed represents “one of the ‘hidden risks’ of the recording system”). It is well established under Minnesota law that when a grantor has “no power” to convey land due to a void deed, the purchaser does not acquire title, and “it is immaterial whether [the purchaser] was a bona fide purchaser or not.” White & St. Townsite Co., 100 Minn, at 22, 110 N.W. at 374; cf. Bausman v. Faue, 45 Minn. 412, 417, 48 N.W. 13, 15-16 (1891) (“[WJhere a deed was stolen from the [owner], or its possession fraudulently got by the [grantor], ... a bona fide purchaser [is] in no better condition than his grantor.”). Accordingly, under longstanding principles of real estate law, First Minnesota could not gain any rights in the property from C&M, even as a bona fide purchaser, because C&M had nothing to convey to First Minnesota. Nothing plus nothing still equals nothing.[5]
*802 3.
First Minnesota acknowledges the “general rule” that a mortgagee — here, First Minnesota — cannot claim an interest in property as a bona fide purchaser if the mortgagor — here, C&M — “held no interest in the property.” However, First Minnesota argues that the general rule does not apply in this case because MHOEPA grants additional rights beyond the common law and the Recording Act that allow a bona fide purchaser to take an interest from a void deed. First Minnesota relies primarily on Minn.Stat. § 325N.17(f)(3), which prohibits a foreclosure purchaser during the cancellation period from “transferring] ... or purporting] to transfer ... any interest in the residence in foreclosure to any third party,” but expressly provides that “no grant of any interest or encumbrance is defeated or affected as against a bona fide purchaser ... for value and without notice of a violation of [MHOEPA].” Because this provision applies even when a foreclosure purchaser “purport[s] to transfer” an interest in property, id., First Minnesota argues that the protections afforded to bona fide purchasers under MHOEPA extend even to purported transfers.
As an initial matter, we observe that section 325N.17(f)(3) has no application here because, by its terms', it does not apply to transfers or purported transfers of property that occur after the cancellation period has expired. See Minn.Stat. § 325N.17(f) (proscribing specified acts “until the time during which the foreclosed homeowner may cancel the transaction has fully elapsed”). Consequently, regardless of the scope of rights available to bona fide purchasers under section 325N.17(f)(3), the provision protects bona fide purchasers only with respect to transactions that take place during the cancellation period. In this case, because C&M did not transfer or purport to transfer an interest in the property to First Minnesota until after the cancellation period had expired,[6] section *803 S25N.17(f)(3) does not provide First Minnesota with rights to the property as a bona fide purchaser.
Remarkably, the dissent asserts that Minn.Stat. § 325N.17(f)(3) applies in this case because “REA’s grant of a mortgage to C&M during the cancellation period was a violation of Minn. Stat. § 325N. 17(f)(3), and the violation triggered the proviso that ‘no grant of any interest is defeated or affected as against a bona fide purchaser or encumbrance for value.’” In other words, the dissent takes a nominal transaction between two Wayman entities for $100, conducted solely to further the scheme, and gives it decisive significance in determining the third-party rights of First Minnesota. Even apart from the fact that C&M cannot be a bona fide purchaser because Wayman necessarily had actual knowledge of his own violations, the dissent reads section 325N.17(f)(3) too broadly. Section 325N.17(f)(3) provides only that a foreclosure purchaser shall not, during the cancellation period, “transfer or encumber or purport to transfer or encumber any interest in the residence in foreclosure to any third party” (emphasis added). Setting aside the lack of any interest for C&M or REA to convey to First Minnesota — and the fact that the transaction between REA and C&M occurred after Graves had cancelled — the dissent’s analysis is inconsistent with the district court’s findings and conclusions. Specifically, the district court concluded that (1) REA and C&M were alter egos of Michael Wayman and that each “could only act through Wayman”; (2) C&M “acted in joint venture with REA”; and (3) REA was “merely a pawn to create a $100.00 mortgage.” Accordingly, there was no transfer or purported transfer of an interest in the property to a third party during the cancellation period that could have triggered the bona-fide-purchaser provision, even under the dissent’s creative interpretation of the transaction that occurred in this case.[7]
We also disagree more broadly with the dissent’s interpretation of the statute, which effectively negates the statutory protections afforded to foreclosed homeowners under MHOEPA. The dissent criticizes us for our “inequitable treatment” of First Minnesota, without mentioning that Graves did everything he was required to do under MHOEPA, yet would still lose his home under the dissent’s approach. In effect, the dissent turns a statute protecting homeowners from the predatory practices of foreclosure purchasers into one protecting third-party lenders at the expense of homeowners. The dissent is, however, correct about one thing: section 325N.17(f)(3) does protect the rights of a bona fide purchaser that obtained an interest in the property during the cancellation period. But it does so only when a homeowner does not cancel the transaction.
The dissent asserts that our interpretation of Minn.Stat. § 325N.17(f)(3) is “farfetched” because the bona-fide-purchaser provision would apply only in “a scenario ... too fanciful to be taken seriously.” According to the dissent, the bona-fide-purchaser rule would apply under our interpretation only in the unlikely scenario that a foreclosed homeowner has strategically allowed the cancellation period to expire without cancelling the transaction. While the posited scenario is indeed unlikely, as the dissent claims, the dissent *804 ignores the far more common scenario in which a homeowner fails to cancel the transaction, the foreclosure purchaser violates some requirement in MHOEPA, and the foreclosure purchaser has conveyed the property to a bona fide purchaser during the cancellation period. Under those circumstances, when a homeowner has failed to cancel the transaction, a bona fide purchaser takes an interest in the property, regardless of the foreclosure purchaser’s violation of “sections 325N.10 to 325N.18,” so long as the bona fide purchaser had no notice of the MHOEPA violations. Minn.Stat. § 325N.17(f)(3). It is only when a homeowner timely cancels a transaction that a bona fide purchaser’s interest is defeated by a homeowner’s superior right to the property.
More fundamentally, the dissent’s interpretation of MinmStat. § 325N.17(f)(3) disregards other provisions of MHOEPA and would have far-reaching consequences for unsuspecting homeowners. For instance, the dissent never explains how its interpretation gives any meaning to the statutory warning, which must accompany both the contract and the cancellation notice, informing a homeowner that he or she may exercise the cancellation right without “any penalty or obligation.” Minn.Stat. § 325N.14(a)-(b).
Furthermore, the dissent’s broad reading of MHOEPA’s bona-fide-purchaser provision, taken at face value, would apparently allow a bona fide purchaser to take an interest in the property even if the foreclosure purchaser had used a forged or stolen deed to convey an interest, so long as the bona fide purchaser had no knowledge of the forgery or theft. According to the dissent, the only two “triggering requirements” for bona-fide-purchaser status under MHOEPA are that the conveyance to the third party must occur during the cancellation period and that the third party must be a “bona fide purchaser ... for value and without notice of a violation of sections 325N.10 to 325N.18.” Yet there is no indication that MHOEPA casts aside the black-letter rule, long recognized by the common law, that to convey an interest in the property, the grantor must actually have an interest to convey. See, e.g., White & St. Townsite Co., 100 Minn, at 22, 110 N.W. at 374; see also Shaw Acquisition Co., 639 N.W.2d at 877-78 (stating the general rule that the Legislature only abrogates the common law by express wording or necessary implication). Just as a bona fide purchaser cannot take an interest from a forged or stolen deed, neither can a bona fide purchaser take an interest when a homeowner has timely cancelled a foreclosure reconveyance.
First Minnesota and the dissent also rely on the bona-fide-purchaser provision in Minn.Stat. § 325N.18, subd. 3, which provides: “[n]o action under this section shall affect the rights in the foreclosed property held by a good faith purchaser for value under sections 507.34, 508.48, 508A.48, or other applicable law.” This section, by its terms, only protects First Minnesota’s existing rights — that is, “rights ... held,” Minn.Stat. § 325N.18, subd. 3 — and does not create additional rights in favor of a third party whose claim of title rests on a void deed. First Minnesota acknowledges that the Recording Act and the common law do not protect a good faith purchaser for value when the underlying transaction is void. Therefore, First Minnesota cannot claim an interest in the property based on Minn.Stat. § 325N.18, subd. 3.
In conclusion, although two provisions of MHOEPA address the bona-fide-purchaser rule, Minn.Stat. § 325N.17(f)(3) and Minn.Stat. § 325N.18, subd. 3, neither creates new rights for a bona fide purchaser nor changes the fact that the quitclaim *805 deed was void because Graves timely exercised his right to cancel the transaction. In short, because the deed underlying First Minnesota’s mortgage was void, First Minnesota took no legal interest in the property based on its claimed status as a bona fide purchaser.
B.
After concluding that First Minnesota is not entitled to rights in the property as a bona fide purchaser, the court of appeals awarded title to the property to Graves, free of the interest of any other party, including First Minnesota. Graves, 816 N.W.2d at 671. First Minnesota argues that the court of appeals failed to consider the consequences of Graves’s failure to redeem the property from the original sheriffs sale. '
We agree that just because First Minnesota lacked a valid mortgage does not necessarily mean that the district court should have awarded the property to Graves. After all, 5 months before the August 2007 transaction between Graves and Wayman, Wells Fargo purchased Graves’s home at a sheriffs sale, and Graves did not redeem the home during the redemption period. Logically, if C&M was not a proper re-demptioner in September 2007 because the quitclaim deed under which it took a mortgage was void, then legal title would have vested in Wells Fargo upon expiration of the redemption period. See Minn.Stat. § 580.12 (2014) (providing that once a sheriffs certificate of sale is recorded, “upon expiration of the time for redemption, the certificate shall operate as a conveyance to the purchaser or the purchaser’s assignee of all the right, title, and interest of the mortgagor”).
First Minnesota argues that granting Graves “free and clear title” is unjust “in light of the fact that it was [First Minnesota’s] funds that redeemed the Property from the prior foreclosure.” Because the equitable arguments have not been fully developed or considered by the courts below, we reversfe the court of appeals’ conclusion that Graves should be awarded title to the property free of any interest of First Minnesota. We also remand to the district court for further proceedings to determine whether First Minnesota has an interest in the property based upon equitable principles. See Knight v. Schwandt, 67 Minn. 71, 74, 69 N.W. 626, 627 (1896) (stating that a party who had redeemed property from a sheriffs sale based on a void deed “was not a legal redemptioner,” but that “it does not follow that his redemption is nugatory as to the purchaser at the mortgage sale, which accepted and retained his money”).[8]
III.
For the foregoing reasons, we affirm the decision of the court of appeals in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded.

. Throughout the litigation, the parties have referred to the law as Minnesota’s Home Ownership and Equity Protection Act, or "MHOEPA,” likely because of the formal name of a similar federal law, the Home Ownership and Equity Protection Act of 1994, see Truth in Lending Act, 15 U.S.C. §§ 1601-67f (2012). Although Minnesota’s law does not appear to have a formal name, we will refer to it here as MHOEPA based on the parties’ reliance on that acronym and the law’s similarity to, and incorporation of, the federal statutory scheme. See Minn.Stat. § 325N.17(a)(4) (2014) (requiring a foreclosure purchaser to comply with the requirements for disclosure, loan terms, and conduct in the federal Home Ownership and Equity Protection Act).

. A "foreclosure purchaser” does not include "a natural person who shows that the natural person is not in the business of foreclosure purchasing and has a prior personal relationship with the foreclosed homeowner” or "a federal or state chartered bank, savings bank, thrift, or credit union.” Neither of these exclusions is relevant to this case. Minn.Stat. § 325N.10, subd. 4.

. First Minnesota also challenges the court of appeals' conclusion that it failed to establish bona-fide-purchaser status. See Graves, 816 N.W.2d at 667. We need not address that question, however, because we agree with the court of appeals’ alternative conclusion that, even if First Minnesota were a bona fide purchaser, it took no interest in the property. See id. at 669. Therefore, for the purpose of our analysis, we assume, without deciding, that First Minnesota was a bona fide purchaser.

. First Minnesota challenges the district court's finding that Graves cancelled the transaction and suggests that, although Graves testified that he cancelled the transaction, he may have cancelled only the rent-back agreement. First Minnesota further argues that the court of appeals erroneously concluded that it had forfeited its right to challenge the finding that there had been a cancellation. See Graves, 816 N.W.2d at 669 (concluding that "[t]he foreclosed homeowners’ cancellation of the quitclaim deed and other documents is real, not purported,” and that First Minnesota “did not file a notice of related appeal to challenge the district court's conclusion”). Regardless of whether First Minnesota properly raised the issue before the court of appeals, it did not preserve the issue for review by this court because it failed to raise the issue in its petition for review. See State v. Koppi, 798 N.W.2d 358, 366-67 (Minn.2011) (explaining that matters not raised in a petition for review are generally deemed forfeited).

. The dissent disagrees with our characterization of the cancelled foreclosure reconveyance as “void," claiming that we actually mean that the transaction was "voidable.” Consistent with the cancellation provisions of MHOEPA, Minn.Stat. § 325N.13, we interpret "void” to mean "[o]f no legal effect; to null,” Black's Law Dictionary 1805 (10th ed.2014), which is consistent with MHOE-PA's direction that a homeowner who timely cancels incurs no "penalty or obligation,” Minn.Stat. § 325N. 14(a). It is clear that, *802 once Graves cancelled the transaction, the Wayman entities had absolutely no legal interest in the property and thus had nothing to convey, contrary to the position adopted by the dissent, which views the foreclosure reconveyance as merely "voidable” — that is, "capable of being affirmed or rejected,” Black’s Law Dictionary 1805. Tellingly, First Minnesota is not claiming an interest in the property under either the Recording Act or the common law. In fact, First Minnesota acknowledges that a bona fide purchaser generally has no protection against a voided transfer. See, e.g., White & St. Townsite Co., 100 Minn, at 22, 110 N,W. at 374. Consequently, the position of the dissent goes beyond the position of First Minnesota and would grant protections to bona fide purchasers under the Recording Act and the common law that even First Minnesota candidly admits that it lacks.

. The length of the cancellation period under MHOEPA expires on the earlier of (1) "midnight of the fifth business day following the day on which the foreclosed homeowner signs a contract that complies” with MHOEPA, or (2) "8:00 a.m. on the last day of the period during which the foreclosed homeowner has a right of redemption.” Minn.Stat. § 325N. 13(a). The district court concluded that the 5-day cancellation period never began to run because the parties never executed a contract that complied with MHOEPA. See Minn.Stat. § 325N. 14(d) (“The five business days during which the foreclosed homeowner may cancel the contract must not begin to run until all parties to the contract have executed the contract and the foreclosure purchaser has complied with this section.”). But even if the district court was correct and the 5-day period never commenced, the cancellation period expired, at the latest, on September 13, 2007, which was the last day of Graves's redemption period. See Minn.Stat. § 325N. 13(a). C&M purported to convey a mortgage to First Minnesota on September 17, which was 4 days after the last day of the redemption period. Therefore, the purported transfer from C&M to First Minnesota occurred after the cancellation period had expired.

. Contrary to the dissent's suggestion, the district court did not conclude that C&M was a "third party” for the purpose of Minn.Stat. § 325N. 17(f)(3). Rather, the district court concluded that Wayman transacted with Graves on behalf of both REA and C&M and that REA and C&M were each “foreclosure purchaser[s]” under Minn.Stat. § 325N.10, subd. 4, "act[ing] in furtherance of a joint venture.”

. The dissent contends that, because we have refrained from setting out “any basis upon which First Minnesota could be entitled to equitable relief,” the prospect of equitable relief must be “illusory.” The court of appeals did not discuss the availability of equitable relief, and First Minnesota did not seek review of any issue relating to equitable relief. Accordingly, our decision to refrain from engaging in a full discussion of the equitable relief to which First Minnesota may be entitled simply reflects our respect for the general rule that we do not address issues that are not properly before us on appeal. See, e.g., State v. Koppi, 798 N.W.2d 358, 366-67 (Minn. 2011).